JUDGE GARDEPHE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

09 CV 4669

_____

VAN WAGNER SPORTS &
ENTERTAINMENT, LLC

           Plaintiff,

v.

BRC GROUP, LLC

           Defendant.

_____

        ____ Civ. ____ (    )

RECEIVED
MAY 18 2009
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiff, Van Wagner Sports and Entertainment, LLC ("VWSE"), by its undersigned counsel, for its Complaint against BRC Group, LLC ("BRC"), alleges as follows:

## NATURE OF THE SUIT

1.     This is an action to recover damages arising from defendant BRC's failure and refusal to pay VWSE amounts owed under an agreement for the provision of services in connection with a soccer tournament and soccer clinics held throughout the United States during 2008. The agreement provided for BRC to pay VWSE a fixed amount for its services. VWSE performed its obligations under the agreement and, despite incurring costs that exceeded the costs used to compute the contract price, sought only the amount to which it was entitled under the agreement. Nevertheless, after praising VWSE's performance, and admitting that the contract amount was owed to VWSE, BRC belatedly shifted positions -- apparently in response to its own financial problems -- and has concocted arguments to justify its failure to pay the contract price. VWSE brings this

458107.3

action to recover the amount owing to it under the plain terms of the agreement, together with interest.

## PARTIES

2.     Plaintiff VWSE is a New York limited liability company with its principal place of business at 800 Third Avenue, New York, New York.  VWSE is a full service sports, entertainment, and media sales and marketing organization.

3.     Defendant BRC is a California limited liability company with its principal place of business at 1550 Bryant Street, Suite 850, San Francisco, California.  BRC is an event marketing and sales group.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that this is a civil action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 (a) (2) in that a substantial part of the events or omissions giving rise to the claims herein occurred in this District.

6.     This Court has personal jurisdiction over BRC under Section 302(a)(1) of New York Civil Practice Law and Rules, based on BRC's transaction of business within the State of New York in connection with the claims asserted in this Complaint.

7.     In addition, BRC has consented to personal jurisdiction in this Court in the agreement that is the subject of this action, which provides, in relevant part, that "the parties to this Agreement hereby accept and submit to the personal jurisdiction of these New York courts [the state courts of New York or the United States District Court for the

458107.3

2

Southern District of New York] with respect to any legal actions, suits or proceedings arising out of this Agreement."

## FACTUAL BACKGROUND

### *The Tournament*

8.      In or about 2004, BRC initiated a program entitled Alianza de Futbol Hispano to develop and support Hispanic soccer in the United States.  In connection with that program, BRC began the Copa Alianza Soccer Tournament (the "Tournament"), a series of Hispanic amateur soccer tournaments, as well as youth clinics (the "Clinics") associated with the Tournament.

9.      By 2008 the Tournament and Clinics had grown, and BRC undertook to carry out its most ambitious program yet of Tournaments and Clinics.  Tournaments were scheduled to take place in ten cities throughout the United States (including New York, Chicago, Los Angeles, San Francisco, Houston, Dallas, Atlanta, Phoenix, El Paso and the District of Columbia) with events spread out over three successive weekends in each location.

10.      On the first two weekends of a Tournament ("Weekends I and II"), local adult amateur soccer teams would compete against one another in round robin elimination matches.  The winning team from Weekends I and II would then compete against a Mexican professional soccer team on the first day of the third weekend ("Weekend III"), and the local all star team would compete against the Mexican professional team on the second day of Weekend III.

11.      Additionally, as part of the Tournament, a National All Star Event ("All Star Event") was to be held in Los Angeles on September 20, 2008.   At the All Star

Event, the Mexican national soccer team would compete against an all-star team comprised of two all-star players from each local team.

12. In addition to the Tournament events, the Clinics were scheduled to take place in 17 markets throughout the country, substantially overlapping the markets where the Tournament would occur and adding other markets (including Philadelphia, Miami, Boston, Denver, Yakima, Kansas City, Grand Rapids and Minneapolis).

13. Pursuant to an agreement between BRC and Fox Sports en Espanol LLC ("Fox"), Fox was the media sponsor for the Tournament. Other national sponsors included Southwest Airlines, Sports Authority and Adidas. The Clinics were sponsored by Verizon Wireless and entitled the Verizon Wireless Youth Clinics.

### VWSE Becomes Involved In The Tournament

14. VWSE's initial involvement with the project was through Fox. VWSE and Fox had a preexisting business relationship, and VWSE responded to a Request for Proposal issued by Fox for the provision of services in connection with the Tournament. VWSE was selected by Fox and, at Fox's instance, BRC then entered into negotiations with VWSE to provide services in connection with the Tournament.

15. VWSE and BRC began discussions about the project in November, 2007. As discussions went along, the scope of work BRC was seeking from VWSE kept evolving, with BRC varying the scope of work it wanted from VWSE and the division of work responsibilities between BRC and VWSE, as well as the work to be performed by the local market managers BRC hired in each location. Discussions continued through the beginning of the Tournament in June, 2008, even as the parties were drafting an agreement.

16.    As summer approached in 2008, and the Tournament neared, the parties were still in discussions over the scope of work requested from VWSE and the likely costs of the project. The Tournament began in June, 2008, and VWSE began working on the Tournament even before the parties had entered into a signed agreement.

17.    On June 30, 2008, BRC countersigned a letter agreement (the "Agreement"), formalizing the terms of the contract between BRC and VWSE.

*The Agreement*

18.    Pursuant to the Agreement, VWSE agreed to "provide general services in connection with the Tournament and the Clinics . . . ." The Tournaments were to take place between May and September 2008 and the Clinics between May and October 2008 (together, the "Tournament Period").

19.    The services to be provided by VWSE, termed "Tournament Services" in the Agreement, included managing participant/team entry administration; securing venues; general pre-event and post-event management and labor staffing and logistics, including obtaining personnel for Tournament and Clinic registration; securing an adequate supply of Tournament and Clinic materials; sourcing and production of Tournament and Clinic-related equipment and creative elements; managing Tournament and Clinic set-up, display and tear-down; shipping Tournament and Clinic materials between markets; providing storage of Tournament and Clinic materials as needed; rendering ongoing budget updates; and providing a final/wrap up report.

20.    In consideration for providing the Tournament Services, BRC agreed to pay VWSE a flat fee of $1,095,570 (the "Tournament Fee"). The Agreement provides that "[t]he 2008 Tournament Fee shall be payable as follows: One Hundred Thousand Dollars ($100,000) upon execution hereof; the remainder of the Tournament Fee shall be

payable twenty-five percent (25%) on July 1, 2008; twenty-five percent (25%) on August 1, 2008; twenty-five percent (25%) on September 1, 2008 and twenty-five percent (25%) within five (5) days of the Tournament completion."

21.     A budget for the Tournament Services was attached to the Agreement as Exhibit A, and VWSE agreed to use "best efforts to produce to budget as attached hereto as Exhibit A." The parties also agreed that "any increases to the budget attached hereto as Exhibit A must be pre-approved by BRC; VWSE shall promptly notify BRC in the event VWSE goes over budget."

22.     Exhibit A consisted of two parts, both of which were drafted by BRC: a summary allocating amounts to four different categories (clinics, Weekend I & II, Weekend III and Nat'l All-Star Game) and totaling $1,095,570 – the same amount as the Tournament Fee payable to VWSE; and a line-item budget broken down into numerous categories.

23.     As an incentive for VWSE to come in under budget, the Agreement provided for VWSE to receive a bonus based on savings on the overall budget. Thus, under a section headed "Budget Savings Incentive," the Agreement provided as follows: "If VWSE produces the Tournament to minimum standards stipulated in this Agreement and does so under the gross amount set forth on the budget attached hereto as Exhibit A, VWSE will retain twenty percent (20%) of all gross savings in the budget as incremental to the Tournament Fee (as defined herein) to VWSE hereunder."

24.     The Agreement further provided that "BRC will indemnify, defend and hold harmless VWSE . . . from and against any and all Claims arising out of (i) any

breach of this Agreement by BRC . . . ." "Claims" is defined to include "losses . . . and costs and expenses, including reasonable attorneys' fees and expenses.

*VWSE Performs the Agreement*

25.     All planned Tournaments and Clinics were held.  VWSE duly performed all of its obligations under the Agreement and did so despite incurring costs in excess of the amounts initially anticipated by VWSE and BRC and reflected in the budget attached to the Agreement.

26.     The increased costs were attributable to a number of factors.  Certain increased costs resulted from unforeseen circumstances, such as spiking gas prices which increased transportation costs.

27.     Other increased costs, however, resulted from BRC's actions during the Tournament Period that increased the expense of the project.  Thus, for example, when the events began, VWSE employees were providing most of the on-site labor in an effort to keep labor costs low.  After a few weeks, however, Brad Rothenberg, who was managing the project on behalf of BRC, informed VWSE that BRC did not want VWSE acting as "labor" during the Tournaments and Clinics and insisted that VWSE hire more outside labor to work at the events.  VWSE told Rothenberg that it would agree to the requests, but that the result would be the project "losing its shirt."  Rothenberg insisted that VWSE go forward, and VWSE did.

28.     Another example involved the local managers retained by BRC. Originally, they were supposed to perform certain on-site tasks at the fields, but they turned out to be unreliable, necessitating the hiring of outside labor.

29.     During the entire Tournament Period, the parties were in virtually constant contact -- by email, phone and in meetings at the Tournaments and Clinics themselves --

to discuss the many operational and logistical issues that inevitably arose in actually carrying out the project and the impact on costs.

30.     VWSE used its best efforts to stay within the budget attached to the Agreement and to notify BRC, and obtain BRC's approval, when VWSE saw that costs would exceed the range contemplated by the parties.

31.     VWSE provided BRC with periodic budget updates.  As part of that process, in July, 2008 – by which time three Weekend III Events, and several more Weekend I and II Events, had already taken place -- the parties held a face-to-face meeting to update the budget.  VWSE presented all expenditures to date and reviewed each part of the budget.  At the meeting, VWSE representatives raised red flags about shipping and printing costs.  BRC had been shipping items from location to location using VWSE's Federal Express account, without VWSE's permission, thus incurring fees far in excess of those initially budgeted by the parties.  Additionally, on a number of occasions BRC had gone to printing vendors with last minute changes to printing jobs, resulting in premium charges for printing, which were charged to VWSE's account.

32.     Throughout the Tournament Period, the parties continued to communicate about the costs and expenses of the project.  A few days after the Tournament Period ended, VWSE provided BRC with a budget wrap-up, as called for in the Agreement.

33.     At the end of October, 2008, after the final invoices from providers had been received and the final costs tallied, the parties held a face-to-face meeting to go over all the costs and expenses in detail.

34.     VWSE representatives flew to San Francisco and met for two days with BRC representatives, beginning on October 28.  At the meeting, VWSE provided BRC

with a detailed budget report, including backup invoices and documentation for each budget item. VWSE informed BRC that, despite the fact that the costs in connection with the Tournament Services exceeded the budgeted amounts, thus reducing VWSE's profit on the project, and although the increased costs were due in large part to BRC's changes and delays, VWSE would abide by the Agreement and not bill BRC for more than the Tournament Fee provided in the Agreement.

35.   BRC acknowledged its fault for the budget overages.  In an email sent immediately after the October 28-29 meeting and dated October 30, 2008, BRC's Brad Rothenberg wrote to VWSE that he "take[s] some responsibility for not being more involved in the management of the budget responsibilities."

36.   In addition to the Tournament Services, VWSE, at BRC's request, had rendered certain services that were not part of the Tournament Services and for which VWSE had no responsibility or obligation (the "Additional Services").  BRC had agreed to pay VWSE separately, over and above the Tournament Fee, for the Additional Services.  The Additional Services resulted in charges totaling $119,703.56, consisting of $100,000 for items included in  BRC's stand alone budget, and $19,703.56 for services in connection with a Clinic that took place in Hawaii.

*BRC's Failure to Pay the Tournament Fee*

37.   The Tournaments and Clinics ended in mid-September, 2008.  BRC was contractually obligated to make installment payments of the Tournament Fee during the Tournament Period on the dates specified in the Agreement, and to complete payment of the Tournament Fee within five days after the Tournament's completion.  BRC, however, failed to make any installment payments, and as of January 8, 2009, nearly four months after the Tournament's completion, BRC had paid only $450,000 out of the $1,095,570

owed to VWSE, leaving a balance due on the Tournament Fee of $645,570, in addition to the amounts due for the Additional Services.

38.    In a January 8, 2009 letter from Brad Rothenberg to VWSE's Alex Gomez, Rothenberg left no doubt about BRC's satisfaction with VWSE's performance. Rothenberg proposed terms for an agreement covering the next two years' Tournament and Clinics, stating: "I am happy to continue working with your existing staff who, with your oversight, capably managed vendors and, with your oversight, interacted expertly with our clients . . . ."

39.    At the same time, however, BRC began negotiating to reduce the Tournament Fee.  In the January 8 letter, Rothenberg asserted that BRC owed VWSE $632,070 under the Agreement, consisting of the $1,095,570 Tournament Fee less a previous $450,000 payment and $13,500 for "trophies" that had been reallocated from VWSE to BRC.  Rothenberg also acknowledged that BRC owed VWSE approximately $100,000 for the Additional Services.  But, claiming that there had been budget overages for labor and trucking that BRC had not been made aware of, Rothenberg proposed paying $600,000 for all amounts due to VWSE.

40.    VWSE refused to go along with a reduction in the amounts to which it was entitled and pointed out that there was no basis for BRC's attempt to avoid paying the amounts owed by reducing amounts owed for the Tournament Fee.  BRC had contracted to pay VWSE the flat Tournament Fee in exchange for VWSE's performance; VWSE had undisputedly performed the Agreement; and VWSE was seeking nothing more that the Tournament Fee that had been agreed to.  Any budget overages, therefore, reduced VWSE's profit, not BRC's.  Moreover, the budget overages were attributable in large

part to BRC's changes and delays, which caused VWSE to incur $60,000 of expenses more than had been contemplated by the parties.

41.    In an email sent three weeks later from Brad Rothenberg to VWSE's Alex Gomez, BRC revealed its true motivation for failing to pay the Tournament Fee: BRC's cash flow problems resulting from, among other things, its own failure to collect from its sponsors.  In the email, dated January 30, 2009, Rothenberg conceded BRC's obligation to pay VWSE an additional $700,000, but, pointing to cash flow problems, stated that it would have to stretch the payments out for a year.  Rothenberg wrote that he and his partner at BRC "have been working on our cash flow for this year based on our current and contractually obligated income.  Based on our situation today, January 30, 2009, here's what we can commit to for a payment schedule, subject to our sponsors paying us on time according to the payment terms in their contract."  Rothenberg then proceeded to lay out a payment schedule which would result in $700,000 of payments to VWSE between February 2009 and February 2010.

42.    The email went on to assure VWSE that "[b]y the end of '09, you will be fully compensated for our 2009 operations and for our 2008 payable except for $200,000 which will be paid in Feb. 2010."  Rothenberg concluded the email by noting: "Next step is for us to conclude our 2009-2010 operating agreement."

43.    By this time, however, VWSE had concluded that BRC was unreliable and VWSE was therefore not interested in working with BRC on future Tournaments and Clinics.  In a series of conference calls held between early February and early March, 2009, VWSE made it clear to BRC that VWSE did not wish to continue doing business with BRC and therefore would not participate in the 2009 or 2010 Tournaments.

44.     Having learned that VWSE would not participate in the 2009 Tournament, BRC apparently decided there was no immediate need to pay VWSE, and shifted to a stonewalling strategy. On March 10, 2009, Rothenberg wrote to VWSE's President, Cliff Kaplan, concocting a litany of charges concerning VWSE's performance under the Agreement. Tellingly, this was the first time since the Tournament Period had ended six months earlier that BRC claimed there were any significant issues relating to VWSE's performance.

45.     VWSE responded by letter dated March 25, 2009, rejecting BRC's allegations; pointing out the lack of credibility in BRC's recent "discovery" of a litany of excuses BRC had not mentioned in its communications with VWSE over the previous six months; and confirming that the balance due from BRC to VWSE as of that date, after taking account of payments previously made by BRC, was $615,273.

46.     Thereafter, BRC paid VWSE an additional $25,000, leaving a balance due from BRC to VWSE for the Tournament Fee of $590,273, which BRC has failed to pay.

## FIRST CAUSE OF ACTION

47.     Plaintiff repeats the allegations of paragraphs 1 through 46 as if fully set forth herein.

48.     The Agreement is a binding agreement between BRC and VWSE.

49.     Pursuant to the terms of the Agreement, BRC was obligated to pay the Tournament Fee of $1,095,570 by paying $100,000 at the time of the execution of the Agreement and the balance in four equal installments on July 1, 2008, August 1, 2008, September 1, 2008 and within five days of completion of the Tournament. The Tournament was completed on September 20, 2008, and payment in full of the final installment of the Tournament Fee was therefore due on September 26, 2008.

50.    Pursuant to additional understandings reached by the parties during the Tournament, BRC was obligated to pay VWSE $119,703.56 for the Additional Services rendered by VWSE on behalf of BRC.

51.    VWSE duly performed all of its obligations under the Agreement.

52.    BRC has paid VWSE a total of $625,000, leaving a balance due on the Tournament Fee of $590,273.56. Despite demand, BRC has failed to pay the remaining $590,273 due and owing to VWSE for the Tournament Fee.

53.    BRC's failure to pay the full amount of the Tournament Fee is a breach of the Agreement.

54.    As a proximate and foreseeable result of BRC's breach of the Agreement, VWSE has been damaged in that, among other things, it has not received the benefit of its bargain under the Agreement, and it has suffered out-of-pocket losses.

55.    By reason of BRC's breach of the Agreement, BRC is liable to VWSE in an amount to be determined at trial, but in no event less than $590,273.56, together with interest.

## SECOND CAUSE OF ACTION

56.    Plaintiff repeats the allegations of paragraphs 1 through 55 as if fully set forth herein.

57.    Under the Agreement, BRC is obligated to indemnify VWSE for all losses, costs and expenses, including reasonable attorneys' fees and expenses, arising out of any breach of the Agreement.

58.    BRC's breach of the Agreement has caused VWSE to sustain losses, costs and expenses, including attorneys' fees and expenses incurred in bringing this action.

59.     By reason of the foregoing, BRC is liable to VWSE in an amount to be determined at trial for all losses, costs and expenses incurred by VWSE and arising from BRC's breach of the Agreement, including attorneys' fees and expenses incurred in connection with this action.

## THIRD CAUSE OF ACTION

60.     Plaintiff repeats the allegations of paragraphs 1 through 59 as if fully set forth herein.

61.     BRC received substantial services from VWSE in connection with the Tournament and Clinics.

62.     The fair and reasonable value of the services provided by VWSE to BRC in connection with the Tournament and Clinics is $1,215,273.56.

63.     BRC has paid VWSE $625,000 for the services VWSE rendered in connection with the Tournament and Clinics, which amount is substantially less than the fair and reasonable value of such services.

64.     BRC will be unjustly enriched, and it would be unfair and unjust, if BRC is allowed to retain the benefits from the services rendered by VWSE in connection with the Tournament and Clinics without paying VWSE the fair value of those services.

65.     By reason of the foregoing, BRC is liable to VWSE for unjust enrichment in an amount to be determined at trial, but in no event less than $590,273.56.

WHEREFORE, plaintiff VWSE demands judgment against defendant BRC as follows:

(i)     On the First Cause of Action, damages in favor of VWSE and against BRC in an amount to be determined at trial, but in no event less than $590,273.56;

(ii)    On the Second Cause of Action, damages in favor of VWSE and against BRC in the amount of all losses, costs and expenses incurred by VWSE and arising from BRC's breach of the Agreement, including attorneys' fees and expenses incurred by VWSE in connection with this action;

(iii)   On the Third Cause of Action, damages in favor of VWSE and against BRC in an amount to be determined at trial, but in no event less than $590,273.56;

(iv)    Interest on the foregoing amounts;

(v)     The costs and disbursements of this action, including reasonable attorneys' fees; and

(vi)    Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury of all issues so triable.

Dated:   New York, New York
         May 18, 2009

GOLENBOCK EISEMAN ASSOR
Bell & Peskoe LLP

By: _____
    David J. Eiseman (DE 4584)
    Allyson R. Albert (AA 1330)

437 Madison Avenue
New York, New York 10022
(212) 907-7300

*Attorneys for Plaintiff Van Wagner Sports & Entertainment, LLC*

*458107.3*                    15