UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------x
                            :

| | |
|---|---|
| VAN WAGNER SPORTS & ENTERTAINMENT, LLC, | Docket No. 09-cv-4669 (PGG) (HP) |
| Plaintiff, | ECF Case |
| | ***ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS*** |
| v. | |
| BRC GROUP, LLC, | |
| Defendant. | |

----------------------------------------------------x

       Defendant/Setoff-Counterclaim Plaintiff BRC Group LLC ("BRC"), by its counsel

Trachtenberg Rodes & Friedberg LLP, for its Answer and Counterclaims in response to the

Complaint of Plaintiff/Setoff-Counterclaim Defendant Van Wagner Sports & Entertainment,

LLC ("VWSE"), dated May 18, 2009 (the "Complaint"), state and allege as follows:

## ANSWERING ALLEGATIONS

### *As To The Nature Of The Suit*

       1.      BRC denies the allegations set forth in paragraph 1 of the Complaint, except

admits that the action purports to recover damages arising from alleged breach of contract.

### *As To The Parties*

       2.      BRC lacks knowledge or information sufficient to form a belief as to the truth of

the allegations set forth in paragraph 2 of the Complaint.

       3.      BRC admits the allegations set forth in paragraph 3 of the Complaint.

*As To Jurisdiction And Venue*

4.      BRC admits the allegations set forth in paragraph 4 of the Complaint.

5.      BRC admits the allegations set forth in paragraph 5 of the Complaint.

6.      BRC admits the allegations set forth in paragraph 6 of the Complaint.

7.      BRC admits the allegations set forth in paragraph 7 of the Complaint.

*As To Factual Background*

8.      BRC admits the allegations set forth in paragraph 8 of the Complaint.

9.      BRC denies the allegations set forth in paragraph 9 of the Complaint, except admits that Tournaments[1] were scheduled to take place in 2008 in the cities enumerated in that paragraph and that the Tournament events were scheduled to take place over three successive weekends in each location.

10.     BRC admits the allegations set forth in paragraph 10 of the Complaint.

11.     BRC admits the allegations set forth in paragraph 11 of the Complaint.

12.     BRC denies the allegations set forth in paragraph 12 of the Complaint, except admits that Clinics were scheduled to take place in 2008 in the cities enumerated in that paragraph.

13.     BRC admits the allegations set forth in paragraph 13 of the Complaint.

14.     BRC lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 14 of the Complaint, except admits that, at Fox's suggestion, BRC entered into negotiations with VWSE to provide services in connection with the Tournament.

---

[1]      Except where otherwise noted or defined, for purposes of its Answer, BRC will adopt, without prejudice and reserving all rights, the capitalized defined terms used in the Complaint.

15.     BRC denies the allegations set forth in paragraph 15 of the Complaint, except admits that discussions about the project began in or around November 2007 and continued through the beginning of the Tournament in June 2008.

16.     BRC denies the allegations set forth in paragraph 16 of the Complaint, except admits that the Tournament began in June 2008 and VWSE began working on the Tournament even before the parties had entered into a signed contract.

17.     BRC admits the allegations set forth in paragraph 17 of the Complaint.

18.     BRC denies the allegations set forth in paragraph 18 of the Complaint and respectfully refers the Court to the Agreement referred to therein for a full and complete statement of its contents, terms and conditions.

19.     BRC denies the allegations set forth in paragraph 19 of the Complaint and respectfully refers the Court to the Agreement referred to therein for a full and complete statement of its contents, terms and conditions.

20.     BRC denies the allegations set forth in paragraph 20 of the Complaint, and respectfully refers the Court to the Agreement referred to therein for a full and complete statement of its contents, terms and conditions.

21.     BRC denies the allegations set forth in paragraph 21 of the Complaint and respectfully refers the Court to the Agreement referred to therein for a full and complete statement of its contents, terms and conditions.

22.     BRC denies the allegations set forth in paragraph 22 of the Complaint, and respectfully refers the Court to the Agreement referred to therein for a full and complete statement of its contents, terms and conditions.

23.     BRC denies the allegations set forth in paragraph 23 of the Complaint and respectfully refers the Court to the Agreement referred to therein for a full and complete statement of its contents, terms and conditions.

24.     BRC denies the allegations set forth in paragraph 24 of the Complaint and respectfully refers the Court to the Agreement referred to therein for a full and complete statement of its contents, terms and conditions.

25.     BRC denies the allegations set forth in paragraph 25 of the Complaint, except admits that all Tournaments and Clinics were held and states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations that VWSE incurred costs in excess of the amounts initially anticipated by VWSE and BRC and reflected in the budget attached to the Agreement.

26.     BRC lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 26 of the Complaint.

27.     BRC denies the allegations set forth in paragraph 27 of the Complaint.

28.     BRC denies the allegations set forth in paragraph 28 of the Complaint.

29.     BRC denies the allegations set forth in paragraph 29 of the Complaint, except admits that BRC and VWSE were in contact during the Tournaments Period.

30.     BRC denies the allegations set forth in paragraph 30 of the Complaint.

31.     BRC denies the allegations set forth in paragraph 31 of the Complaint, except admits that the parties held a face-to-face meeting in July 2008.

32.     BRC denies the allegations set forth in paragraph 32 of the Complaint.

33.     BRC lacks knowledge and information sufficient to form a belief as to the truth of the allegations set forth in paragraph 33 of the Complaint, except admits that the parties had a face-to-face meeting in October 2008.

34.     BRC denies the allegations set forth in paragraph 34 of the Complaint, except admits that VWSE representatives met for two days with BRC representatives, beginning on October 28.

35.     BRC denies the allegations set forth in paragraph 35 of the Complaint.

36.     BRC lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 36, except admits that BRC requested VWSE to perform certain services that were not part of the Tournament Services.

37.     BRC denies the allegations set forth in paragraph 37 of the Complaint and respectfully refers the Court to the Agreement referred to therein for a full and complete statement of its contents, terms and conditions, except admits that the Tournaments and Clinics ended in mid-September 2008 and that BRC had paid $450,000 to VWSE as of January 8, 2009.

38.     BRC denies the allegations set forth in paragraph 38 of the Complaint, except admits that on or about January 8, 2009 Brad Rothenberg sent a letter to Van Wagner, and respectfully refers the Court to the letter for a full and complete statement of its contents.

39.     BRC denies the allegations set forth in paragraph 39 of the Complaint and respectfully refers the Court to the letter referred to therein for a full and complete statement of its contents.

40.     BRC denies the allegations set forth in paragraph 40 of the Complaint, except admits that the parties had certain discussions regarding their respective positions.

41.     BRC denies the allegations set forth in paragraph 41 of the Complaint, except admits that Brad Rothenberg sent an email to Alex Gomez on or about January 30, 2009 and respectfully refers the court to the email for a full and complete statement of its contents.

42.     BRC denies the allegations set forth in paragraph 42 of the Complaint and respectfully refers the court to the email referred to therein for a full and complete statement of its contents.

43.     BRC denies the allegations set forth in paragraph 43 of the Complaint, except states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations that VWSE had concluded that BRC was unreliable and VWSE was therefore not interested in working with BRC on future Tournaments and Clinics, and admits that VWSE indicated to BRC that it would not participate in the 2009 or 2010 Tournaments.

44.     BRC denies the allegations set forth in paragraph 44 of the Complaint, except admits that Mr. Rothenberg sent a letter to Cliff Kaplan on March 10, 2009 and respectfully refers the court to the letter for a full and complete statement of its contents.

45.     BRC denies the allegations set forth in paragraph 45 of the Complaint, except admits that it received a letter from VWSE dated March 25, 2009 and respectfully refers the court to the letter for a full and complete statement of its contents.

46.     BRC denies the allegations set forth in paragraph 46 of the Complaint, except admits that it paid VWSE an additional $25,000 in April 2009 without prejudice to its claims as articulated herein.

### As To The First Cause Of Action

47.     BRC repeats and realleges its answers to paragraphs 1 through 46 as though fully set forth herein.

48.     BRC admits the allegations of paragraph 48 of the complaint.

49.     BRC denies the allegations set forth in paragraph 49 of the Complaint, and respectfully refers the Court to the Agreement referred to therein for a full and complete statement of its contents, terms and conditions.

50.     BRC denies the allegations set forth in paragraph 50 of the Complaint, except states that it lacks knowledge and information sufficient to form a belief as to the truth of the allegations concerning the actual costs of the work performed by VWSE.

51.     BRC denies the allegations set forth in paragraph 51 of the Complaint.

52.     BRC denies the allegations set forth in paragraph 52 of the Complaint, except admits that BRC has paid VWSE $625,000.

53.     BRC denies the allegations set forth in paragraph 53 of the Complaint.

54.     BRC denies the allegations set forth in paragraph 54 of the Complaint.

55.     BRC denies the allegations set forth in paragraph 55 of the Complaint.

### As To The Second Cause Of Action

56.     BRC repeats and realleges its answers to paragraphs 1 through 55 as though fully set forth herein.

57.     BRC denies the allegations set forth in paragraph 57 of the Complaint and respectfully refers the Court to the Agreement referred to therein for a full and complete statement of its contents, terms and conditions.

58.     BRC denies the allegations set forth in paragraph 58 of the Complaint.

59.     BRC denies the allegations set forth in paragraph 59 of the Complaint.

### *As To The Third Cause Of Action*

60.     BRC repeats and realleges its answers to paragraphs 1 through 59 as though fully set forth herein.

61.     BRC denies the allegations set forth in paragraph 61 of the Complaint, except admits BRC that VWSE performed various services for BRC in connection with the Tournaments and Clinics.

62.     BRC denies the allegations set forth in paragraph 62 of the complaint.

63.     BRC denies the allegations set forth in paragraph 63 of the Complaint, except admits that it has paid VWSE $625,000.

64.     BRC denies the allegations set forth in paragraph 64 of the complaint.

65.     BRC denies the allegations set forth in paragraph 65 of the complaint.

## AFFIRMATIVE DEFENSES

1.     The Complaint fails to state a claim upon which relief may be granted.

2.     Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

3.     Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

4.     Plaintiff's claims are barred, in whole or in part, by the doctrine of waiver.

5.     Plaintiff's claims are barred, in whole or in part, by the doctrine of estoppel.

6.     Plaintiff's claims are barred, in whole or in part, as a result of its own breaches of contract and failures of performance.

7.     Plaintiff's claims are barred, in whole or in part, due to illegality.

**<u>SETOFFS/COUNTERCLAIMS</u>**

Setoff and Counterclaim-Plaintiff BRC, as for its setoffs and counterclaims against Setoff and Counterclaim-Defendant VWSE, hereby alleges as follows:

***The Soccer Tournaments and Clinics***

1.      In or about 2004, BRC founded Alianza de Futbol Hispano.  The purpose of Alianza de Futbol Hispano was to develop and support Hispanic soccer in the United States.  As part of Alianza de Futbol Hispano, BRC created the Copa Alianza Soccer Tournaments, a series of Hispanic amateur soccer tournaments that took place in locations throughout the United States.

2.      In 2008, BRC scheduled Copa Alianza Soccer Tournaments in ten United States cities and metropolitan areas:  New York, San Francisco Bay Area, Los Angeles, Phoenix, El Paso, Dallas, Houston, Atlanta, Washington, D.C., and Chicago (the "Tournaments").  The Tournaments were scheduled to occur between May and September 2008.

3.      The Tournaments in each location consisted of events conducted on three successive weekends.  During the first two weekends, local amateur adult soccer teams played against one another in a round robin elimination tournament.  The winning team from the first two weekends then played against a Mexican professional soccer team on the first day of weekend three.  One the second day of weekend three, a local all-star team played against the Mexican professional team.

4.      BRC also scheduled a National All Star Event in Los Angeles, California on September 20, 2008.  In the All Star event, a team comprised of the two best players from each local team played against the Mexican national team.

5.      In addition, BRC scheduled clinics to take place in seventeen United States cities, in many of which a Tournament was also taking place:  Boston, Kansas City, Minneapolis, Phoenix, Denver, Dallas, Houston, Atlanta, Washington, D.C., New York, Chicago, San Francisco, Los Angeles, Grand Rapids, Philadelphia, Miami, and Yakima (the "Clinics").  The Clinics were scheduled to take place between May and November of 2008.  Clinics that were scheduled in the same cities as Tournament events took place during the same time period as the Tournament.

*Negotiations over the Agreement and the Budget*

6.      Fox Sports en Espanol LLC ("Fox") was the media sponsor of the Tournaments. Verizon Wireless was the named sponsor of the Clinics.  Southwest Airlines, Sports Authority, Sears and Adidas were also sponsors of the Tournaments and Clinics.

7.      Fox and Sears contracted with VWSE for VWSE to provide logistics, transportation and labor in connection with Fox's sponsorship of the Tournaments and Clinics. At Fox's suggestion, BRC entered into negotiations with VWSE for VWSE to manage and execute the Tournaments and Clinics.

8.      BRC and Van Wagner entered into negotiations on a contract in November 2007. The original draft of the Agreement was created by VWSE and provided to BRC for its comment and suggested changes.  Alex Gomez, a Vice President at VWSE, negotiated the Agreement on behalf of VWSE.  Brad Rothenberg, one of the managing partners of BRC, negotiated on behalf of BRC.

9.      In connection with negotiations over the Agreement, Mr. Rothenberg, Mr. Gomez and Allison Lucey, an account director at VWSE assigned to the BRC account, jointly developed

a line-item budget for VWSE's services for the Tournaments and Clinics.  Everyone agreed that the line item budget would be attached to and incorporated into the Agreement as an exhibit.

10.      The line item budgets for weekends I and III and the Clinics were developed based upon a format BRC had used for previous years tournaments and clinics.  For Weekend II, VWSE created a new, separate line item budget.  VWSE set out line item categories and provided a city-by-city, item-by-item budget for the Weekend II programs.

11.      BRC and VWSE discussed the costs for each line item in great detail, and concluded discussions on each line item only when both parties agreed on a cost estimate for that item.  VWSE and BRC also discussed each line item cost for each city due to the variable costs from city to city for venues, hotels and other items in each city column.

12.      However, for certain line items, including labor and transportation, BRC relied upon VWSE to prepare the budget because these were areas in which VWSE had substantial experience and expertise.  In fact, VWSE's experience and expertise in planning and executing labor, transportation and logistics for multiple location events is part of what attracted BRC to the Agreement with VWSE.

13.      BRC clearly stated in all conversations regarding the line item budget that BRC would only pay VWSE at or below each line item's estimated cost, unless VWSE notified BRC prior to the expenditure and obtained BRC's permission for the overage.  Savings in one area could not be applied to overages in another without BRC's permission.  BRC would not have entered into the Agreement had VWSE not consented to these conditions.  This line item and approval process was consistent with BRC operating practice for its prior tournaments and clinics, as well as consistent with the standard industry practice with programs such as the Tournaments and Clinics.  BRC also clearly stated that it would be willing to reallocate savings

to overages on a case-by-case basis, but that VWSE must obtain BRC's approval before incurring any overage.  VWSE agreed to BRC's requirements concerning the line item budget and approval of overages.

14.     The line-item budget, VWSE's strict adherence with it, and the requirement that any overage be pre-approved was insisted upon by BRC for a number of reasons.  BRC wanted to ensure that the budget and expenses for the Tournaments and Clinics was closely monitored and tracked by VWSE.  VWSE promised to provide weekly updated to BRC on the status of the line item budget and expenses.

15.     In addition, BRC wanted to maximize savings on the line item budget.  BRC made clear to VWSE that it wanted to save $250,000 to $300,000 from the collective amount of the line item budget.  For example, on February 14, 2008, Mr. Rothenberg emailed Mr. Gomez and told him that BRC wanted about $300,000 in savings on the line-item budget to ensure BRC's profitability.

16.     VWSE accepted this proposal and edited the draft Agreement accordingly.  On March 7, 2008, Mr. Gomez provided BRC with an updated version of the Agreement, incorporating the comments of BRC, VWSE's counsel and Cliff Kaplan, a VWSE executive.  Mr. Gomez's cover email highlighted one change to the Agreement:  "Lastly, we inserted a potion of the fee to be secured as we are spending considerable time and other resources against the project while we lock down the final details of the program."

17.     Later that day, after reviewing the updated draft of the Agreement, Mr. Rothenberg emailed Mr. Gomez regarding the updated line item budget.  Mr. Rothenberg informed Mr. Gomez that BRC has increased VWSE's fees set out in the line item budget to

$141,000.  In addition, Mr. Rothenberg informed Mr. Gomez that he was "still expecting we need to save about $250K to hit our target for profit."

18.     Later on March 7, Mr. Gomez replied to Mr. Rothenberg's email and stated that he felt VWSE could produce its services as required by the Agreement and save BRC between $250,000 and $350,000 from the line item budget.

> All I can say is thank you for continuing to work with us.  I'm still confident that we can ultimately not only gain efficiencies to hit the $250+ BRC profit target but also find the remaining 100 and change that I'm looking to find without compromising the integrity of the deliverables.

19.     In order to give VWSE an incentive to manage and execute the Tournaments and Clinics at or below each item on the line item budget, the parties agreed upon a bonus be paid to VWSE.  Mr. Rothenberg outlined the interplay of the bonus the budget in a March 23, 2008 email to Mr. Gomez:

> The final thing I want to discuss in relation to the agreement is our understanding regarding the budget; there will be a budget in Exhibit A that outlines our mutually agreed costs that will be your responsibility to provide.  In so doing and if you are under budget for the collective amount of those mutually agreed items (all of Exhibit A), VWSE will be eligible for the bonus I've outlined.

20.     Later that day, Mr. Gomez replied to Mr. Rothenberg's email:  "On the budget, I'll give you whatever assurances you need.  As for bonus for coming in under, we'll only take one provided that we also deliver you a min of 250k+ in savings."

21.     At no time did BRC tell VWSE that VWSE could allocate line item budget savings or the collective amounts of the line item budget in any way that VWSE wished.  In fact, if such an arrangement had been made, BRC never would have negotiated for a line item budget. Rather, BRC would have agreed to a flat fee for VWSE's services and would not have negotiated for a budget savings bonus nor for the overage approval conditions.

*The Agreement*

22.     BRC's and VWSE continued to develop the line item budget into June 2008.  On June 30, 2008, BRC countersigned the Agreement.  BRC only signed the agreement after the line item budget had been finalized and approved by both BRC and VWSE.  After the Agreement was executed, Mr. Rothenberg again reiterated to Mr. Gomez that BRC wanted to save between $250,000 and $300,000 off of the line item budget, which would result in VWSE collecting approximately $900,000 for its services under the Agreement.  VWSE at no time objected or claimed it were entitled to be paid the collective amount of the line item budget for its services regardless of overages and savings, regardless of how it performed against the line item budget.

23.     The Agreement provided that VWSE would provide "Tournament Services," collectively defined as "general services in connection with the Tournaments and the Clinics." VWSE was obligated to "[m]anage and execute the Tournament in each of ten (10) markets and the Clinics in each of seventeen (17) markets, including the following:  Management of participant/team entry administration . . . Securing all venues for the Tournament . . . General pre and post event management and labor staffing and logistics . . . Securing of adequate supply of Tournament and Clinic materials . . . Sourcing and Production of Tournament and Clinic related equipment and creative elements . . . Management of Tournament and Clinic set-up, display and tear down . . . [and] Shipping of Tournament and Clinic materials between markets [and] Provision of secure storage of Tournament and Clinic materials as needed."  Tournament Services also included providing BRC with "Ongoing budget updates" and a "Final/Wrap up report."

24.     Consistent with the terms that BRC and VWSE had negotiated, a line item budget was attached to Agreement as Exhibit A and the terms of the Agreement provided that "VWSE

14

will use best efforts to produce to budget as attached hereto as <u>Exhibit A</u>; any increases to the budget attached hereto as <u>Exhibit A</u> must be pre-approved by BRC; VWSE shall promptly notify BRC in the event VWSE goes over budget."

25.     Also consistent with the terms BRC and VWSE negotiated, the Agreement contained a "Budget Savings Incentive" clause which provided "If VWSE produces the Tournament to minimum standards stipulated in this Agreement and does so under the gross amount set forth on the budget attached hereto as <u>Exhibit A</u>, VWSE will retain twenty percent (20%) of all gross savings in the budget incremental to the Tournament Fee (as defined herein) to VWSE hereunder."

26.     In exchange for the Tournament Services, BRC agreed to pay a "Tournament Fee" to VWSE of $1,095,570.  Although this amount was equal to collective amount of the line item budget attached to the Agreement as Exhibit A (which included both the line item expenses for the Tournaments and Clinics as well as VWSE's negotiated management fee), it was the clear understanding of the parties that VWSE would only be compensated by BRC for funds expended on behalf of BRC at or below the line item budget estimates, any BRC approved overages, its management fee, and, if VWSE saved more than $250,000 on the line item budget, twenty percent of those savings.

27.     The Agreement also set out a schedule for BRC to pay VWSE portions of the Tournament Fee.  Tellingly, the Agreement does not required BRC to pay set amounts on certain dates.  Rather, it only requires a set payment of $100,000 at execution of the Agreement, and then <u>percentages</u> of the Tournament Fee at certain pre-determined dates:  "the remainder of the Tournament Fee shall be payable twenty-five percent (25%) on July 1, 2008, twenty-five percent

(25%) on August 1, 2008, twenty-five percent (25%) on September 1, 2008 and twenty-five

percent (25%) within five (5) days of the Tournament completion."

28.     As further evidence that $1,095,570 was not the agreed upon payment for the

Tournament Services, Tournament Fee, by the terms of the Contract, can be adjusted during the

term of the Agreement:  the "Tournament Fee [] remain[s] subject to adjustment in the event of a

change in the scope of the Tournament Services to be provided by VWSE."

29.     In addition to the Tournament Services, VWSE was also obligated to provide

"Sales Services", in which "VWSE shall provide . . . general sales and marketing services in

connection with the Events" including "pursuing potential client leads interested in any of the

Events, [s]ecuring sponsorships with existing and potential new clients approved by BRC . . .

[and] communicating regularly with BRC executives regarding sponsorship matters."  "Events"

was defined in the Agreement as Tournaments, Clinics and any ancillary properties.  As

compensation for Sales Services, VWSE was to receive commission on the amount of

advertising and sponsorship revenue it brought to BRC.

30.     The Agreement also provides that:

> VWSE will indemnify, defend and hold harmless BRC . . . from
> and against any and all third party claims, damages, liabilities,
> losses, government proceedings and costs and expenses, including
> reasonable attorneys' fees and expenses (collectively "Claims")
> arising out of (i) any breach of this Agreement by VWSE, and (ii)
> any negligent action or omission by VWSE in performing this
> Agreement.

31.     On or about June 11, 2008, BRC paid VWSE $100,000, as it was required to do

upon execution of the Agreement.

*VWSE's Negligence, Breach of Contract, and Failures of Performance*

32.     From the beginning of the Tournaments and Clinics, VWSE failed to comply with its obligations as set forth in the Agreement to provide BRC with regular updates regarding the line item budget.  VWSE did contact BRC to obtain approval to incur certain overages, mostly regarding printing, signage and shipping.  However, VWSE did not provide BRC with the weekly updates on the line item budget that VWSE promised to provide.  In fact, it was not until after Mr. Rothenberg flew to New York in July 2008 and requested budget information that BRC received its first budget update.  That update was incomplete, as VWSE's operations staff could not identify specific overages to the line item budget.

33.     VWSE failed to produce the Tournaments and Clinics for at least $250,000 less than the collective amount of line item budget, as VWSE promised to BRC.

34.     VWSE failed to perform the Sales Services that it contracted to under the Agreement.

35.     VWSE failed to institute inventory procedures or controls on the trucks carrying the merchandise, equipment and apparel for the Tournaments and Clinics, resulting in thousands of dollars of lost or stolen merchandise, equipment and apparel.

36.     VWSE hired unqualified local labor, causing additional work for the local managers that BRC hired for the Tournaments and Clinics and causing damage to equipment owned by BRC and the local venues.  By way of example, the local labor in the Atlanta, Georgia was responsible for the theft of approximately $30,000 in equipment that the venue had rented, including a mower, trailer and bobcat loader.  VWSE also overstaffed Tournaments and Clinics. At one event, Mr. Rothenberg observed that approximately thirty percent of all the local labor

hired by VWSE was standing around doing nothing and was not directed or managed as to their duties and responsibilities.

37.     VWSE lost key materials for the Tournaments and Clinics, including jersey's balls and press backdrops.

38.     VWSE consistently failed to meet the requirements of Verizon Wireless, the named sponsor of the Clinics, regarding consistent color and appearance of tents, signage and field boards.

39.     VWSE failed to return BRC's apparel, equipment, signage, jerseys, and other items at the end of the Tournaments and Clinics.  In or around early March 2009, BRC requested that VWSE return these items to BRC's exclusive possession and control. As of the date of this Answer with Counterclaims, VWSE has failed to return these items, and upon information and belief, they are located in VWSE's warehouse in Chicago, Illinois.

40.     VWSE failed to produce the Tournaments and Clinics to the minimum standards stipulated in the Agreement.

***The Post Tournament Events***

41.     The Tournaments and Clinics finished in September 2008.  As BRC did not receive its weekly budget updates, it was very interested to receive the final budget wrap up report to see where VWSE was able to save the $250,000 they had promised.

42.     In or about October 28, 2008, Mr. Gomez and Ms. Lucey went to BRC's offices to provide BRC with the end of project budget and wrap up report.  This would be the first time BRC received any detailed budget information.  At this time, Mr. Gomez and Ms. Lucey gave BRC a partial accounting of the Tournaments and Clinics.  It was at this meeting that BRC, as

well as Ms. Lucey and Mr. Gomez, first became aware of large overages in the various line items, and thus an overage to the collective amount of the line item budget.

43.     When Mr. Rothenberg asked about the overages and where the $250,000 in savings that Mr. Gomez had promised to provide was, Mr. Gomez conceded that VWSE had overspent without BRC's permission, failed to provide the savings that VWSE had promised, and stated that he "had his tail between his legs."

44.     At the October 2008 meeting, VWSE also provided BRC with copies of all invoices, which VWSE claimed were for costs associates with the Tournaments and Clinics, as well as a spreadsheet purported to list all the invoices.  The spreadsheet did not correlate to the invoices, and BRC was unable to determine what expenses fell into what line item category or what expenses were incurred on behalf of the Tournaments and Clinics.  For example, the information provided by VWSE included invoices and expenses that clearly were unrelated to the Tournaments and Clinics, including invoices for Major League Baseball All-Star Game tickets and travel expenses for Joakim Noah, the center for the Chicago Bulls, as well as expenses related to a New York Yankees sponsorship, Fox Cable Networks and the Jet Blue JFK Terminal opening.

45.     Then, in plain contradiction to the terms of the Agreement and VWSE's promises to BRC, VWSE for the first time contended that it was entitled to be paid for the collective amount of the line item budget, including its management fee, for a total of $1,095,570.  BRC disagreed, and reminded VWSE that under the contract and the line item budget, VWSE was only entitled to the amount expended at of under each line item cost estimate, plus overages pre-approved by BRC, and that savings in a line item belonged to BRC and could not be applied to an overage in another line item without BRC's approval.  As BRC did not pre-approve the

majority of the overages that VWSE wished to collect payment for, BRC refused to pay the overages and requested further information regarding the budget and VWSE's expenses so that BRC could accurately determine how much VWSE was owed for its services.

46.     Despite Plaintiff's contentions otherwise, BRC was and is willing to pay VWSE for the expenses that were occurred on BRC's behalf.  As of January 8, 2009, BRC had paid VWSE approximately $450,000 to cover expenses that could be traced to the Tournaments and Clinics.  On or about February 6, 2009, even in light of VWSE's huge unapproved overages, BRC still paid an additional $150,000 to VWSE to cover expenses that could be traced to the Tournaments and Clinics.

47.     In March of 2009, VWSE finally provided BRC with an updated accounting of the line item budget for the Tournaments and Clinics.  VWSE provided a spreadsheet to BRC that indicated that, rather than save BRC $250,000 as VWSE promised and committed, VWSE spent approximately $295,000 over the line item budget.  Of these overages, approximately $120,000 was related trucking and approximately $50,000 was related to labor.  These two areas of the line item budget were developed by VWSE based on VWSE's experience and expertise in the areas.

48.     BRC never received notice before the majority of these expenses were incurred by VWSE.  BRC was never given the opportunity to approve these budget overages, as was required by the contract, BRC was denied the opportunity to save on expenses, as VWSE promised, and to increase its profits.

49.     In addition, upon learning of the huge overages in transportation and labor, BRC made inquiries with the contractors that VWSE hired to perform these services at the Tournaments and Clinics.  BRC learned that while BRC was billed for 100% of the labor costs

associated with the Tournaments and Clinics, 50-75% of the on site labor was for Fox and Sears,

sponsors that also had contracts with VWSE.  In addition, BRC learned that 50-75% of the space

in the trucks used to transport the equipment, apparel and other items between the cities was used

for those same sponsors.  Naturally, BRC refused to pay for these overages as they were incurred

by VWSE on behalf of other clients and requested further information to investigate how much

of the labor and transportation costs were attributable to BRC.

50.     On or about March 10, 2009, Mr. Rothenberg wrote to Cliff Kaplan outlining

BRC's concerns and questions about VWSE's performance, VWSE's compliance with the

budget, and the unapproved overages. Mr. Rothenberg proposed to pay the actual expenses that

could be attributed to BRC at that time, and to withhold further payment of VWSE's

management fee and for other expenses incurred by VWSE until these expenses could be

rectified.

51.     On March 26, 2009, Mr. Kaplan replied to Mr. Rothenberg's proposal.  Mr.

Kaplan accused BRC of reneging on its payment obligations because VWSE had indicated it was

not prepared to work with BRC on future Tournaments and Clinics.  Kaplan claimed that VWSE

met its obligations under the agreement, and that BRC owed to VWSE the full tournament fee of

$1,095,570, plus certain other expenses, leaving a balance due of VWSE $615,273.00.  Mr.

Kaplan further stated that if BRC did not enter into an agreement to pay the entire balance (in

two installments in April and August, 2009) by April 3, 2009, then VWSE would turn the matter

over to its attorneys.

52.     On April 2, 2009, Mr. Rothenberg replied to Mr. Kaplan.  Mr. Rothenberg stated

that BRC was not trying to avoid full payment, but that there was an obvious disagreement

between the parties regarding the budget status of the Agreement.  Mr. Rothenberg again reiterated the issues of his earlier letter, and stated that BRC would pay all "justifiable expenses."

53.     On or about April 13, 2009, BRC made a further payment to VWSE of $25,000 to cover costs incurred by VWSE at or below line item cost estimates.

## FIRST SETOFF/COUNTERCLAIM
### (Breach of Contract)

54.     BRC repeats and realleges paragraphs 1 through 53 as if fully set forth herein.

55.     VWSE and BRC entered into the Agreement, a binding contract.

56.     Attached to the Agreement was a line item budget, mutually developed and approved by BRC and VWSE.

57.     VWSE breached its obligations under the Agreement by, among other things, failing to obtain BRC's prior approval for all budget overages, failing to provide BRC with weekly budget updates, failing to provide BRC with a Final/Wrap up report as required by the Agreement, failing to use its best efforts to provide the Tournament Services as set forth in to the line item budget attached as Exhibit A, failing to produce the Tournaments and Clinics at a savings of at least $250,000 less than the collective amount of the line-item budget, failing to produce the Tournaments and Clinics to minimum standards stipulated in the Agreement, failing to provide the Tournament Services as required by the Agreement, including failing to institute inventory procedures, loosing or allowing to be stolen key equipment and apparel, hiring unqualified labor, and overstaffing events, failing to provide the Sales Services, and failing to return BRC's apparel, equipment, signage and other items at the completion of the Tournaments and Clinics.

58.     As a result of these breaches of the Agreement, BRC has been damages in an amount to be determined at trial but not less than $250,000.

## SECOND SETOFF/COUNTERCLAIM
### (Negligence)

59.     BRC repeats and realleges paragraphs 1 through 58 as if fully set forth herein.

60.     VWSE had a duty to perform under the Agreement, including the Tournament Services, with ordinary care and in accordance with the general customs and practices of others engaged in its business and industry.

61.     VWSE failed to act with ordinary car and in accordance with the general customs and practices of others engaged in its business by, among other things, failing to institute inventory procedures, loosing or allowing to be stolen key equipment and apparel, and hiring unqualified labor.

62.     By failing to act with ordinary care and in accordance with the general customs and practices of VWSE's business, it was foreseeable that VWSE would cause injury and damages to BRC and the Tournaments and Clinics.

63.     As a result of VWSE's negligence, BRC has been damaged in an amount to be determined at trial but not less than $75,000.

## THIRD SETOFF/COUNTERCLAIM
### (Replevin)

64.     BRC repeats and realleges paragraphs 1 through 63 as if fully set forth herein.

65.     BRC gave VWSE temporary possession of its equipment, signage, apparel, and other items used for the Tournaments and Clinics so that VWSE could transport the items from location to location and use them in accordance with its duties under the Agreement.  VWSE remains in possession of these items today.

66.     At all relevant times BRC was the rightful and legal owner of the equipment, signage, apparel, and other items in the possession of VWSE.

67.     In or around early March 2009, BRC requested that VWSE return these items to BRC's exclusive possession and control.

68.     VWSE has not returned these items to BRC's exclusive possession and control.

69.     BRC is entitled to a court order requiring VWSE to return these items to BRC's exclusive possession and control.

## FOURTH SETOFF/COUNTERCLAIM
**(Indemnity)**

70.     BRC repeats and realleges paragraphs 1 through 69 as if fully set forth herein.

71.     Under the terms of the Agreement, VWSE is obligated to indemnify BRC for all losses, costs and expenses, including reasonable attorneys' fees and expenses, arising out of any breach of the Agreement or any negligent action or omission by VWSE in performing the Agreement.

72.     VWSE's breach of the Agreement and negligent actions and omissions have caused BRC to incur costs and expenses, including attorneys' fees and expenses incurred in brining this action.

73.     By reason of the foregoing, VWSE is liable to BRC in an amount to be determined at trial for all losses, costs and expenses incurred by BRC and arising from VWSE's breach of the Agreement and negligent actions and omissions in performing the Agreement, including attorneys' fees and expense incurred in connection with this action and the defense of VWSE's action.

**WHEREFORE**, Defendant/Setoff-Counterclaim Plaintiff demands judgment against Plaintiff/Setoff-Counterclaim Defendant VWSE as follows:

(1)     On the first cause of action, damages in favor of BRC and against VWSE in an amount to be determined at trial, but not less than $250,000;

24

(2)     On the second cause of action, damages in favor of BRC and against VWSE in an amount to be determined at trial, but not less than $75,000;

(3)     On the third cause of action, a court order requiring VWSE to return all of BRC's property in VWSE's possession to BRC or BRC's counsel;

(4)     On the fourth cause of action, damages in favor of BRC and against VWSE in the amount of all losses, costs and expenses incurred by BRC and arising from VWSE's breach of the Agreement and negligent actions and omissions in performance of the Agreement, including attorneys' fees and expenses incurred by BRC in connection with this action and in defense of VWSE's action;

(5)     Interest on the foregoing amounts;

(6)     The costs and disbursements of this action, including reasonable attorneys' fees; and

(7)     Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Defendant/Setoff-Counterclaim Plaintiff demands trial by jury of all issues so triable.

Dated: New York, New York
       June 30, 2009

**TRACHTENBERG RODES & FRIEDBERG LLP**

By:  /s Barry J. Friedberg
              Barry J. Friedberg (BF 7337)

545 Fifth Avenue
New York, New York 10017
(212) 972-2929

*Attorneys for Defendant and Counterclaim Plaintiff
BRC Group, LLC*